S00A1610. CLARK et al. v. WADE et al.
S00A2014. DRIVER et al. v. RAINES.
(544 SE2d 99)

FLETCHER, Presiding Justice.

In these two child custody disputes, the maternal grandparents challenge the trial court's award of custody to the noncustodial father. The trial courts found in both cases that it would be in the best interest of each child to remain with his grandparents, but struck down the "best-interest-of-the-child" standard in OCGA § 19-7-1 (b.1) as unconstitutional. We granted the grandparents' discretionary applications to determine whether the best-interest-of-the-child standard is constitutional in custody disputes between a parent and a third party. Considering the fundamental rights of parents, we construe the custody statute as requiring the third party to show by clear and convincing evidence that parental custody would harm the

child in order to rebut the statutory presumption in favor of the parent. With that narrowing construction, we uphold as constitutional the best interest standard when applied to custody disputes between a biological parent and custodial third party under OCGA § 19-7-1 (b.1). Therefore, we reverse and remand.

## I. FACTS AND PROCEEDINGS

Both of these appeals concern a custody dispute between a single, noncustodial parent and relatives who have physical custody of the child. Thus, these cases do not involve the removal of a child from the parent's home, but rather the possible reunification of parent and child.[1]

### S00A1610. Clark v. Wade.

Warren Wade was born in 1994 to Melissa Wright and Douglas Wade and has lived with his maternal grandparents, Margie and James Clark, since 1995. When Warren's parents divorced in 1996, his mother was awarded custody. She left him to be raised by his grandparents, who were already raising his older brother, and Warren's father exercised regular visitation rights. In 1999, Melissa Wright was arrested for a drug violation, and Douglas Wade sought custody of their five-year-old child. The trial court awarded him temporary custody, and the grandparents moved to intervene in the custody proceeding. The trial court found that it would be in the best interest of the child to remain in the custody of the grandparents, but struck down the best interest standard in OCGA § 19-7-1 (b.1) as "constitutionally insufficient" and awarded custody to the father. This Court granted the grandparents' application to appeal to consider whether the statute was unconstitutional under our ruling in *Brooks v. Parkerson*.[2]

### S00A2014. Driver v. Raines.

Justin Casey Veal was born in 1992 and is the child of Dawn Driver and John Raines, who never married. The child has lived with his mother and maternal grandparents most of his life. The state sought child support from the father in 1995; the father filed a peti-

---

[1] Cf. *Wade v. Wade*, 272 Ga. 526 (531 SE2d 103) (2000) (reversing award of custody in divorce action to paternal grandmother when custody dispute was between fit mother and father). See generally Carolyn Wilkes Kaas, *Breaking Up a Family or Putting It Back Together Again: Refining the Preference in Favor of the Parent in Third-Party Custody Cases*, 37 WM. & MARY L. REV. 1045 (1996).

[2] 265 Ga. 189 (454 SE2d 769) (1995).

tion for legitimation in 1996; and Justin lived with his father from June 1996 to January 1997. When Justin returned home to his mother and grandparents, he complained about his arm and doctors determined that it had been broken for a week. The father filed a petition for custody, and the maternal grandparents intervened. In response to the father's constitutional challenge, the trial court ruled that § 19-7-1 (b.1) failed to articulate any standard and allowed the factfinder to substitute its subjective judgment about the child's best interest for the parent's decision, thus depriving parents of their liberty and privacy interests in the care, custody, and management of their children. Accordingly, the trial court held that the statute was unconstitutional and awarded custody to the father. This Court granted the grandparents' application and consolidated their appeal with *Clark v. Wade*.

## II. STATUTORY CONSTRUCTION

OCGA § 19-7-1 (b.1) governs custody disputes between a biological parent and a limited number of third parties who are related to the child. They include a grandparent, aunt or uncle, great aunt or uncle, sibling, or adoptive parent. The statute provides that a parent may lose custody if a trial court determines that the best interest of the child supports an award of custody to the third party. There is a presumption that it is in the child's best interest to remain in the custody of the parent, but the third party may rebut that presumption. The statute provides:

> [I]n any action involving the custody of a child between the parents or either parent and a third party limited to grandparent, great-grandparent, aunt, uncle, great aunt, great uncle, sibling, or adoptive parent, parental power may be lost by the parent, parents, or any other person if the court hearing the issue of custody, in the exercise of its sound discretion and taking into consideration all the circumstances of the case, determines that an award of custody to such third party is for the best interest of the child or children and will best promote their welfare and happiness. There shall be a rebuttable presumption that it is in the best interest of the child or children for custody to be awarded to the parent or parents of such child or children, but this presumption may be overcome by a showing that an award of custody to such third party is in the best interest of the child or children. The sole issue for determination in any such case shall be what is in the best interest of the child or children.[3]

---

[3] OCGA § 19-7-1 (b.1) (1999).

Enacted in 1996, this statute adopts the same standard — best interest of the child — for custody disputes between a parent and third party as applies in custody disputes between two parents[4] or third parties.[5] The primary difference is that OCGA § 19-7-1 (b.1) establishes a rebuttable presumption that parental custody is always in the child's best interest, thus favoring the biological parent over the third party.

## Parental Rights and Fitness Standards

In construing statutes, we must consider the legislative intent, keeping in mind "the old law, the evil, and the remedy."[6] Under prior case law, the biological parent had a prima facie right to custody in an initial contest with any third party, including grandparents,[7] stepparents,[8] and adopting parents.[9] A third party who sought custody had to show that (1) the parent had lost his or her parental power or (2) the parent was unfit.[10]

Under the parental rights standard, a third party could gain custody in a dispute with a parent only by proving by clear and convincing evidence that the parent had lost his or her parental power.[11] A parent could lose parental power in one of these ways: voluntary contract, consent to adoption, failure to provide necessaries or abandonment, consent to the child's receiving the proceeds of his labor, consent to the child's marriage, cruel treatment, or rearing the child under immoral influences.[12]

Strict adherence to the parental rights standard sometimes resulted in unjust decisions that ignored the health and welfare of the child. For example, this Court reversed an award of custody to a stepfather with whom the child had lived and ruled instead that the

---

[4] See OCGA § 19-9-3 (a) (2) (1999); *Carvalho v. Lewis*, 247 Ga. 94, 95 (274 SE2d 471) (1981); *Gazaway v. Brackett*, 241 Ga. 127, 128 (244 SE2d 238) (1978); see also *Ivey v. Ivey*, 264 Ga. 435, 437 (445 SE2d 258) (1994) (in divorce, no preference for biological parent when custody dispute is between biological parent and adoptive parent).

[5] See *Stills v. Johnson*, 272 Ga. 645, 650 (533 SE2d 695) (2000).

[6] OCGA § 1-3-1 (a) (1990).

[7] See *Childs v. Childs*, 237 Ga. 177 (227 SE2d 49) (1976).

[8] See *White v. Bryan*, 236 Ga. 349 (223 SE2d 710) (1976) (affirming award of custody of four-year-old daughter to stepfather after death of mother based on evidence that natural father was unfit).

[9] See *In re Baby Girl Eason*, 257 Ga. 292 (358 SE2d 459) (1987) (adopting fitness standard to determine right of unwed father to legitimate child whom mother placed for adoption).

[10] See *Childs*, 237 Ga. at 178.

[11] See *Miele v. Gregory*, 248 Ga. 93, 94 & n. 1 (281 SE2d 565) (1981).

[12] See OCGA §§ 19-7-1 (b), 19-7-4; *Waldrup v. Crane*, 203 Ga. 388 (46 SE2d 919) (1948); see generally Dan E. McConaughey, *Georgia Divorce, Alimony and Child Custody,* §§ 24-7 to 24-11 (25th ed. 1999).

biological father was entitled to custody after the mother's death, despite his having provided no financial support or sought any visitation with his daughter in the seven years since his divorce from the mother.[13] Our decision was based in part on the well-settled legal principle that a parent's failure to support a minor child was not "a failure to provide necessaries or such abandonment as will amount to a relinquishment of the right of the parent to parental custody and control" when the mother never sought support.[14] As one commentator concluded after reviewing the cases on relinquishment of a child by voluntary contract, "[A]dherence to the parental rights doctrine has led child custody cases into the thickets of the technicalities of contract law and away from the more relevant question of what is best for the child."[15]

Because of the harshness of the parental rights standard, this Court adopted a second standard by which a parent could lose custody in exceptional circumstances.[16] Under the fitness standard, the third party had to prove by clear and convincing evidence that the biological parent was unfit. In deciding parental unfitness, the trial court had to restrict its inquiry to the parent's present fitness; it could not rely on evidence of the parent's past unfitness[17] or compare the parent's ability to raise the child with the superior fitness of a third person.[18]

> A finding of unfitness must center on the parent alone, that is, can the parent provide for the child sufficiently so that the government is not forced to step in and separate the child from the parent. A court is not allowed to terminate a parent's natural right because it has determined that the child might have better financial, educational, or even moral advantages elsewhere. Only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship.[19]

---

[13] See *Howell v. Gossett*, 234 Ga. 145, 146-147 (214 SE2d 882) (1975); see also *Chapin v. Cummings*, 191 Ga. 408 (12 SE2d 312) (1940) (removing ten-year-old child from home of stepfather who had raised child from infancy and awarding custody based on father's prima facie right to custody on mother's death).

[14] Id. at 147.

[15] McConaughey, *Georgia Divorce* § 24-8.1, at 487; see, e.g., *Rawdin v. Conner*, 210 Ga. 508, 511 (81 SE2d 461) (1954) (refusing to find a definite contract because details were lacking about how grandparents were to rear and educate child).

[16] See *Perkins v. Courson*, 219 Ga. 611, 623 (135 SE2d 388) (1964) (holding that third party could challenge parent's legal right to custody on grounds of unfitness).

[17] See *Blackburn v. Blackburn*, 249 Ga. 689, 692 (292 SE2d 821) (1982).

[18] See *Carvalho*, 247 Ga. at 95.

[19] Id. (Citation omitted.)

Although this standard appears fair on its face, its application has caused unfair results because of its reliance on biological connections to the exclusion of other important considerations.[20] The fitness standard does not consider the absence of a custodial relationship between parent and child, the parent's conduct in causing any separation, the emotional bond that the child has developed with the third party due to their day-to-day relationship, or the age, maturity, and special needs of the child. Rather, it automatically vests custody in a biological parent, unless the parent is unfit, to the exclusion of the other relatives who have performed the parental role of nurturing and caring for the child.[21]

Just as this Court adopted the fitness standard to ameliorate the undesirable consequences of the parental rights standard, we have on occasion rejected or ignored the fitness standard based on "exceptional circumstances."[22] Our overriding concern in these cases has been the interest and welfare of the child. Moreover, a review of third-party custody cases shows that neither the fitness nor the parental rights standard has prevented the trial court from substituting its own judgment when the parent's behavior offended the court.[23] As a result, this Court adopted a rational factfinder test for reviewing child custody decisions on appeal.[24]

---

[20] See *Knox v. Knox*, 226 Ga. 619, 620 (176 SE2d 712) (1970) (custody of nine-year-old daughter cannot be granted to adult stepbrother merely because noncustodial father has not maintained a close relationship with his daughter); *Peck v. Shierling*, 222 Ga. 60 (148 SE2d 491) (1966) (reversing award of custody of 11-year-old boy to paternal aunt and uncle with whom he had lived for two years and to whom father had given custody because they failed to prove mother was unfit).

[21] See *Howell*, 234 Ga. at 146-147; cf. *Ghrist v. Fricks*, 219 Ga. App. 415, 420 (465 SE2d 501) (1995) ("we have held time and time again that the court *must* consider the best interest and welfare of the child before granting a legitimation petition, and that it is not bound by the desires and contentions of the biological parents").

[22] See *Triplett v. Elder*, 234 Ga. 243, 244-245 (215 SE2d 247) (1975) (trial court did not abuse its discretion in finding that best interests of children would be served by remaining together in custody of paternal grandmother who had cared for them for nine years after father's death); *Williams v. Ferrell*, 231 Ga. 470 (202 SE2d 427) (1973) (trial court did not abuse its discretion by finding "in effect" that fit mother had lost her right to custody of 15-year-old child who had leukemia and had lived with paternal grandmother, except for occasional visits with mother, since she was 13 months of age).

[23] See *Wade*, 272 Ga. at 527 (trial court's finding of mother's unfitness based solely on her involvement with a man other than her husband during the couple's separation); *Blackburn*, 249 Ga. at 689 (trial court's finding of mother's unfitness based, in part, on her giving birth to an illegitimate, racially mixed child); *Bennett v. Clemens*, 230 Ga. 317, 319 (196 SE2d 842) (1973) (trial court awarded custody of nine-year-old to paternal grandparents, despite father's objections, based on mother's working for underground newspapers, being placed on probation for possession of marijuana, leaving child with four female friends to attend her mother's funeral, engaging in sexual acts with men and women, and teaching child about "the gay life").

[24] See *In re B. D. C.*, 256 Ga. 511, 512 (350 SE2d 444) (1986); *Blackburn*, 249 Ga. at 694.

*Best Interest Standard*

In enacting OCGA § 19-7-1 (b.1), the legislature changed the law governing parent-third party custody disputes and added an additional way by which parental power could be lost.[25] The Georgia General Assembly intended to replace the parental unfitness standard with the best-interest-of-the-child standard.[26] Adoption of this new standard shifts the trial court's inquiry solely from the current fitness of the biological parent to raise the child to include consideration of the child's interest in a safe, secure environment that promotes his or her physical, mental, and emotional development. In considering what is in the best interest of the child, the trial court may consider the child's historical relationship with the parent, the child's relationship with the third-party custodian, and the child's special medical, emotional, or educational needs.

What has not changed under the new standard are three presumptions: (1) the parent is a fit person entitled to custody, (2) a fit parent acts in the best interest of his or her child, and (3) the child's best interest is to be in the custody of a parent.

## III. CONSTITUTIONALITY OF BEST INTEREST STANDARD

In considering the constitutionality of the Georgia statute on parent-third party custody disputes, there are two relevant lines of cases. One involves the termination of parental rights, which have usually required a showing of parental unfitness before ending the parent-child relationship.[27] The other involves third-party visitation rights, which have historically considered the best interests of the child.

*Termination of Parental Rights*

The Fourteenth Amendment of the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." The United States Supreme Court has recognized that parents have a fundamental liberty interest in the care, custody, and management of their children.[28] Based on this liberty interest, the Court has concluded that parents have

---

[25] See 1996 Ga. Laws 412.

[26] See generally Conrad D. Brooks, Peach Sheet, *Parent and Child Relationship Generally: Provide a Standard for Loss of Parental Power*, 13 GA. ST. U. L. REV. 155 (1996).

[27] See *Thorne v. Padgett*, 259 Ga. 650, 651 (386 SE2d 155) (1989); see also *Baby Girl Eason*, 257 Ga. at 297 (adopting a fitness standard to evaluate unwed father's right to legitimate his biological child when he has not abandoned his "opportunity to develop a relationship").

[28] See *Troxel v. Granville*, 530 U. S. 57 (120 SC 2054, 2060, 147 LE2d 49) (2000).

the right to establish a home, direct the upbringing of their children, and control their children's education,[29] and the state may not sever the rights of parents in their natural child in a neglect proceeding unless it proves by clear and convincing evidence that the parents are unfit to raise their children.[30]

In cases dealing with the rights of unwed fathers, however, the Court refused to adopt unfitness as the sole standard for enforcing a biological father's due process rights, instead distinguishing between a developed parent-child relationship and a potential relationship. For example, the Court in *Stanley v. Illinois*[31] held that an unwed father who had lived with his children and supported them all their lives was entitled to a hearing in a dependency proceeding on his fitness as a parent before the state could take away his children. In contrast, in *Lehr v. Robertson*,[32] where the putative father had assumed no parental responsibility, the Court concluded that his biological link did not merit the same protection as the father's significant custodial, personal, and financial relationship with his children in *Stanley*. " '(The) importance of the familial relationship . . . stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in "(promoting) a way of life" through the instruction of children . . . as well as from the fact of blood relationship.' "[33]

In *Quilloin v. Walcott*,[34] a case arising out of this state, the Supreme Court rejected the unwed father's contention that he was entitled to an absolute veto over the adoption of his child absent a finding of his unfitness. Instead, the Court concluded that the unwed father's substantive due process rights were not violated by rejecting his petition to legitimate the child and finding that the stepfather's adoption was in the child's best interest. The Court noted that the case did not involve the breakup of a "natural family," a biological father who had ever sought custody of his child, or the placement of the child with a new set of parents. "Rather, the result of the adoption in this case is to give full recognition to a family unit already in existence."[35] Thus, even when the parental bond is to be severed, the United States Constitution permits courts to use a "best interests" standard.

Unlike the parental termination cases, third-party custody cases

---

[29] See *Pierce v. Society of Sisters*, 268 U. S. 510 (45 SC 571, 69 LE 1070) (1925); *Meyer v. Nebraska*, 262 U. S. 390 (43 SC 625, 67 LE 1042) (1923).

[30] See *Santoksy v. Kramer*, 455 U. S. 745, 747-748 (102 SC 1388, 71 LE2d 599) (1982).

[31] See 405 U. S. 645, 649 (92 SC 1208, 31 LE2d 551) (1972).

[32] 463 U. S. 248, 260-263 (103 SC 2985, 77 LE2d 614) (1983).

[33] See id. at 263 (citation omitted).

[34] 434 U. S. 246 (98 SC 549, 54 LE2d 511) (1978).

[35] See id. at 255.

do not sever the relationship between parent and child. Instead, the parent retains significant rights, including the right to visitation and to obtain custody under changed circumstances.[36] When parental rights are not severed, federal constitutional law does not require a showing that the parent is unfit before custody may be awarded to a third party.[37]

## Grandparent Visitation Cases

In the second line of cases, this Court held in *Brooks v. Parkerson* that our state grandparents' visitation statute was unconstitutional under both the Georgia Constitution and United States Constitution because it failed to require a showing of harm before visitation could be ordered.[38] Reviewing the parents' protected interest in raising their children against the state's interest in protecting a child, we concluded that "state interference with a parent's right to raise children is justifiable only where the state acts in its police power to protect the child's health or welfare, and where parental decisions in the area would result in harm to the child."[39] As a result, the Georgia General Assembly amended the grandparent visitation statute to require a finding of harm to the health or welfare of the child before visitation is granted.[40]

The Supreme Court's decision last term in *Troxel v. Granville*[41] raises the question whether we correctly interpreted federal constitutional law as requiring a showing of harm to the child before a state may intervene in the parent's right to raise his or her family. In *Troxel*, the Court declined to strike down the Washington state statute on grandparent visitation as facially invalid, instead holding it unconstitutional as applied.[42] The plurality found that the Washington statute was "breathtakingly broad," allowing any person at any time to petition for visitation rights, and contained no requirement that the parent's decision about visitation was entitled to any deference or presumption of validity.[43] Although the state supreme court had the opportunity to give the statute a more narrow interpretation, it had declined to do so. Reviewing the facts in the case, the Court

---

[36] See *Gazaway*, 241 Ga. at 128, 129; see also OCGA § 19-9-3 (a) (4) (parent may gain custody when the child turns 14 if the child chooses); *Skipper v. Smith*, 239 Ga. 854 (238 SE2d 917) (1977) (parent retains right to consent to child's adoption despite transfer of legal custody to another person).

[37] See *In re Custody of C.C.R.S.*, 892 P2d 246, 254-255 (Colo. 1995).

[38] 265 Ga. at 194.

[39] Id. at 193.

[40] See OCGA § 19-7-3 (c) (1999).

[41] 530 U. S. 57.

[42] See *Troxel*, 120 SC at 2065.

[43] See id. at 2061.

found that the trial court failed to give any weight to the fit custodial parent's decision, established a presumption in favor of grandparent visitation that the parent had to disprove, and failed to give significant weight to the parent's offer of meaningful visitation to the grandparents.[44]

Because the Court based its decision on the sweeping breadth of the statute and the trial court's application of the statute's unlimited power, it did not decide whether due process required all grandparent visitation statutes to include a showing of harm as a condition precedent to granting visitation.[45] The Court's plurality decision expressed hesitancy in holding that specific nonparental visitation statutes violate due process as a per se matter, agreeing with Justice Kennedy that the constitutionality of any standard for awarding visitation depends on the manner in which the standard is applied.[46] In his dissent, Justice Kennedy notes that every state, except Georgia, employs the best-interest-of-the-child standard and establishes a variety of ways to ensure that parental decisions are given respect.[47]

Unlike the grandparent visitation cases, however, the custody cases in this appeal do not involve a third party seeking to intrude upon an established parent-child custodial relationship. Instead, they involve a biological parent seeking to gain custody from a third party who has been responsible for the daily care of the child and already has established a family unit for the child. Thus, the relationship among the parent, child, and third-party relative differs in these custody cases from the relationship among the parties in *Troxel* and other grandparent visitation cases. Applying the Court's distinction in the unwed father cases, more than a biological link exists between the child and noncustodial father, but the relationship does not rise to the level of a daily association.[48]

## IV. CONSTITUTIONALITY OF OCGA § 19-7-1 (b.1)

Parents have a constitutional right under the United States and Georgia Constitutions to the care and custody of their children. This right to the custody and control of one's child is "a fiercely guarded right . . . that should be infringed upon only under the most compel-

---

[44] See id. at 2062-2063.

[45] See id. at 2064.

[46] See id. (citing state supreme court decisions interpreting Maryland and Virginia statutes); id. at 2075 (Kennedy, J., dissenting).

[47] See also id. at 2070-2071 (Stevens, J., dissenting) (finding no support for state supreme court's holding that Federal Constitution requires a showing of actual or potential harm before trial court may order visitation over parent's objections).

[48] See *Lehr*, 463 U. S. at 263.

ling circumstances."[49] Based on our decision in *Brooks*, the state may interfere with a parent's right to raise his or her child only when the state acts to protect the child's health or welfare and the parent's decision would result in harm to the child.[50] Under the parental termination cases, the amount of constitutional protection to be according a biological parent depends on that person's commitment to his parental responsibilities in raising his child.

Aligned against the parents' constitutional right is the child's constitutional right to protection of his or her person[51] and the state's compelling interest in protecting the welfare of children.[52]

> [Although] in most instances it will be found that the legal right of the parent and the interest of the child are the same[, i]f through misconduct or other circumstances it appears that the case is exceptional, and that the welfare of the child requires that it should be separated even from its parent, the parens patriae must protect the helpless and the innocent.[53]

Relying on this doctrine, we have upheld the constitutionality of laws that terminated the parental rights of mentally deficient parents who were incapable of caring for their children[54] and allowed a 14-year-old to select the custodial parent.[55] Thus, in certain circumstances, the legislature may enact statutes that permit a child's interest to prevail over a parent's constitutional right to custody.

In enacting the parent-third party custody statute, the Georgia General Assembly avoided the constitutional defects that the U. S. Supreme Court plurality found in the Washington visitation statute. First, OCGA § 19-7-1 (b.1) expressly limits third parties who may seek custody to a specific list of the child's closest relatives, including an adoptive parent. Second, the statute defers to the fit parent's decision on custody by establishing a rebuttable presumption in favor of parental custody. What is left open for judicial interpretation is how to determine that an award of custody to the third party "is for the best interest of the child or children and will best promote their welfare and happiness."

---

[49] *In re Suggs*, 249 Ga. 365, 367 (291 SE2d 233) (1982).

[50] See *Brooks*, 265 Ga. at 194.

[51] See 1983 Ga. Const. art. I, sec. I, para. II.

[52] See *In re J. C.*, 242 Ga. 737, 738 (251 SE2d 299) (1978).

[53] See id. at 738 (quoting *Williams v. Crosby*, 118 Ga. 296, 298 (45 SE 282) (1903)).

[54] See 242 Ga. at 738-739.

[55] *Froug v. Harper*, 220 Ga. 582, 585 (140 SE2d 844) (1965).

## Construing the Best Interest Standard

Our judicial responsibility requires us to consider the legislature's intent in enacting the law and to construe the statute to give effect to that intent when possible. This role means that we must give a narrowing construction to a statute when possible to save it from constitutional challenge.[56]

Applying a narrowing construction that is consistent with both the legislature's intent and *Brooks v. Parkerson*, we interpret the "best-interest-of-the-child" standard in OCGA § 19-7-1 (b.1) as requiring the third party to show that parental custody would harm the child to rebut the statutory presumption in favor of the parent. Once this presumption is overcome, the third party must show that an award of custody to him or her will best promote the child's health, welfare, and happiness.

By harm, we mean either physical harm or significant, long-term emotional harm; we do not mean merely social or economic disadvantages.[57] In addition, we note that the death of a parent, divorce, or a change in home and school will often be difficult for a child, but some level of stress and discomfort may be warranted when the goal is reunification of the child with the parent.

In considering the issues of harm and custody, trial courts should consider a variety of factors that go beyond the parent's biological connection or present fitness to encompass the child's own needs. These factors should include:

(1) who are the past and present caretakers of the child;[58]

(2) with whom has the child formed psychological bonds and how strong are those bonds;[59]

(3) have the competing parties evidenced interest in, and contact with, the child over time;[60] and

(4) does the child have unique medical or psychological

---

[56] See *Gravely v. Bacon*, 263 Ga. 203, 206 (429 SE2d 663) (1993); *City of Hapeville v. Anderson*, 246 Ga. 786 (272 SE2d 713) (1980).

[57] See *Chapin v. Cummings*, 191 Ga. 408 (12 SE2d 312) (1940) ("the 'paramount interest of the child' shall not be taken to mean that the court would in any given contest simply determine where the child might have the better financial, educational, or even moral advantages"); see also 1983 Ga. Const. art. I, sec. I, para. XXV (social status of citizen shall never be the subject of legislation).

[58] See *Ortner v. Pritt*, 419 SE2d 907 (W. Va. 1992); see generally Carol A. Crocca, Annotation, *Continuity of Residence as Factor in Contest Between Parent and Nonparent for Custody of Child Who Has Been Residing with Nonparent – Modern Status*, 15 ALR5TH 692 (1993).

[59] See *Comer v. Comer*, 300 SE2d 457 (N.C. App. 1983).

[60] See *In re Brandon L.E.*, 394 SE2d 515 (W. Va. 1990).

needs that one party is better able to meet.[61]

An analysis of these factors, keeping in mind the statutory presumption of parental custody, will enable courts to award custody to a third-party relative only when a real threat of harm would result from parental custody.

### Standard of Proof

Normally, "the degree of proof required in a particular type of proceeding is the kind of question which has traditionally been left to the judiciary to resolve."[62] Because of the importance of the individual interests involved, we conclude that the same standard of proof should apply in custody disputes between parents and third parties as applies in termination cases.[63] That is, a third-party relative may overcome the statutory presumption in favor of parental custody only by presenting clear and convincing evidence that the award of custody to the parent is not in the best interest of the child. Although we adopt this more stringent burden of proof primarily because of the significance of the parent-child relationship, we note additionally that trial courts have considerable experience in applying it in custody disputes.[64]

### V. CONCLUSION

In conclusion, we interpret the best interest standard in the parent-third party custody statute to mean that the third party must prove by clear and convincing evidence that the child will suffer physical or emotional harm if custody were awarded to the biological parent. Once this showing is made, the third party must then show that an award of custody to him or her will best promote the child's welfare and happiness. With that construction of the statute, we uphold the best-interest-of-the-child standard as constitutional when applied to custody disputes between a noncustodial parent and third party under OCGA § 19-7-1 (b.1).[65]

*Judgments reversed and cases remanded. All the Justices concur,*

---

[61] See *Triplett*, 234 Ga. at 244 (considering need of mentally retarded child for constancy in environment and routines); *Williams v. Ferrell*, 231 Ga. at 470 (considering emotional and medical needs of child suffering from leukemia).

[62] See *Santoksy*, 455 U. S. at 755-756 (citation omitted).

[63] See id. at 758-761.

[64] See, e.g., *Miele*, 248 Ga. at 93-94.

[65] See *Price v. Howard*, 484 SE2d 528 (N.C. 1997) (best interest of child test does not offend due process in custody dispute between custodial nonparent and parent when parent's conduct has been inconsistent with his or her constitutionally protected status as a natural parent).

*except Sears and Hunstein, JJ., who concur specially and Carley, Thompson and Hines, JJ., who dissent.*

SEARS, Justice, concurring specially.

I concur in the judgment of the majority opinion, and applaud the majority for resolving a difficult issue that this Court and our State legislature have struggled with for many years.

In reaching its decision, however, the majority, in dicta, unnecessarily criticizes our holding in *Brooks v. Parkerson*[66] that both the Georgia Constitution and the United States Constitution require a finding of harm to a child before grandparent visitation can be ordered. I disagree with this criticism, and emphasize that, despite the majority's criticism of *Brooks*, the majority ultimately reaffirms the principles of *Brooks* by holding that disputes between parents and third parties concerning the custody of the parents' children must be resolved using the rigorous harm standard adopted in *Brooks*.

I also write to highlight the fact that the present disputes are between parents who have not cared for their children for a significant period of time and relatives who have stepped forward to do so. In these "reunification" cases,[67] the day-to-day bond of the parent-child relationship already has been interrupted, and the child may have formed strong and lasting relationships with the person who has been caring for him. I believe that, for these cases, the majority opinion properly recognizes a preference for the reunification of the parent and child, but permits a third party to prevent that reunification if the third party can meet the stringent harm standard set forth in the majority opinion.

It is critical to distinguish these "reunification" cases from cases in which a third party seeks to break apart an intact parent-child relationship by seeking custody of the parents' child.[68] When a third party seeks to remove a child from the care of his or her parents, an even more stringent standard than that applied in the present case is necessary for the removal to be constitutional. In such "removal" cases, only the traditional parental fitness test can be constitutionally applied,[69] resulting in the removal of the children only when the

---

[66] 265 Ga. 189 (454 SE2d 769) (1995).

[67] See Carolyn Wilkes Kaas, *Breaking Up a Family or Putting It Back Together Again: Refining the Preference in Favor of the Parent in Third-Party Custody Cases*, 37 Wm. & Mary L. Rev. 1045, 1058-1059 (1996). In her article, Wilkes uses the term "reunification" to describe cases such as these, and the term "removal" to describe cases in which there is an on-going parent-child relationship, and a third party seeks to break that bond by seeking custody of the children.

[68] Id. at 1055-1056.

[69] See generally Wilkes at 1068, 1085-1087, 1108-1111.

parents "are incapable of taking adequate care of their children."[70]

Finally, I take issue with the assertion in Justice Hunstein's special concurrence that the changing face of the American family justifies the application of a best-interest-of-the-child standard when a third party seeks to obtain custody of a parent's child. To the contrary, I find that the lamentable decline in the traditional family supports the harm standard adopted in the majority opinion. The best interest standard would erect unnecessary barriers to the reunification of a parent and child in appropriate cases by permitting a third party to retain custody of a child simply because the third party may be better able to provide for the child's future and education. The best interest standard thus would facilitate the decline of the traditional parent-child family. On the other hand, the harm standard would stem the decline of the nuclear family by fostering the reunification of parent and child. That standard, however, also grants trial courts the flexibility to permit third parties to retain custody when physical or emotional harm would result to the child if custody were changed.

For the foregoing reasons, I concur specially in the majority opinion.

HUNSTEIN, Justice, concurring specially.

We are called upon in these appeals to determine whether the application of the best interest of the child standard in OCGA § 19-7-1 (b.1), the Georgia statute governing custody disputes between parents and certain third parties, violates the constitutional rights of competent parents to raise their children without undue interference by the State. I concur in the majority's decision that OCGA § 19-7-1 (b.1) is constitutional but write separately because I reject the majority's finding that in order to save the statute from constitutional challenge we must engraft onto the best interest of the child standard a categorical rule that authorized third parties who seek custody of a child must always first demonstrate that parental custody would harm the child. This precondition is not constitutionally required because the statute, as written and intended to be applied by the General Assembly, properly balances the competing constitutional interests of parents, children and the State.

While I agree with the majority that parents' interests in raising their children without undue interference of the State is one of the oldest and most fundamental of liberty interests, in my view the conclusion that a showing of harm is constitutionally required rests, in large part, upon the misplaced and often incorrect assumption that the parents have been the child's primary caregivers and that third

---

[70] Id. at 1108.

parties who seek custody have no legitimate or established relationship with the child. In reality, many children today are being raised not by their parents but by other family members with a strong attachment to the child and who have lovingly and responsibly acted in the role of the child's parent. The relationships that form from such attachments, although not always biological, are of importance to both the child and society because they "derive from the intimacy of daily association, and from the role it plays in 'promot(ing) a way of life' through the instruction of children. [Cit.]" *Smith v. Organization of Foster Families for Equality and Reform*, 431 U. S. 816, 844 (II) (B) (97 SC 2094, 53 LE2d 14) (1977). As recognized by Justice Benham in *Brooks v. Parkerson*, 265 Ga. 189, 201-202 (454 SE2d 769) (1995):

> Parental autonomy is grounded in the assumption that natural parents raise their own children in nuclear families, consisting of a married couple and their children. . . . The realities of modern living, however, demonstrate that the validity of according almost absolute judicial deference to parental rights has become less compelling as the foundation upon which they are premised, the traditional nuclear family, has eroded. . . . More varied and complicated family situations arise as divorces, and decisions not to marry, result in single-parent families; as remarriages create step-families; as some parents abandon their children; as others give them to temporary caretakers; and as still others are judged unfit to raise their own children. One of the frequent consequences, for children, of the decline of the traditional nuclear family is the formation of close personal attachments between them and adults outside of their immediate families. . . . It . . . [is] shortsighted indeed, for this court not to recognize the realities and complexities of modern family life, by holding today that a child has no rights, over the objection of a parent, to maintain a close extra-personal relationship. . . .

(Benham, J., dissenting) quoting *Roberts v. Ward*, 493 A2d 478, 481 (N.H. 1985).

Even the United States Supreme Court has acknowledged the changing demographics of the American family. In *Troxel v. Granville*, 530 U. S. 57 (120 SC 2054, 2059, 147 LE2d 49) (2000), the plurality noted that according to U. S. Department of Commerce, Bureau of Census Statistics, in 1996, 28 percent of children in the United States lived in single parent households, while in 1998 approximately 4 million children, 5.6 percent of all children under the age of

18, lived in the household of their grandparents. *Troxel*, supra, 120 SC at 2059 (II). See also id., 120 SC at 2077-2078 (Kennedy, J., dissenting) (conventional nuclear family is no longer the structure or prevailing condition in many households). Due, at least in part, to the changing face of the American family, most states, including Georgia, have attempted to protect the welfare of the children and the relationships they have formed with family and de facto parents by enacting nonparental visitation and custody statutes. These statutes are further supported by the recognition of the State's interest in protecting the welfare of its children as parens patriae as well as the interests of the child in protecting established familial or family-like bonds. See *Prince v. Massachusetts*, 321 U. S. 158, 166 (64 SC 438, 88 LE 645) (1944); *Troxel*, supra, 120 SC at 2071-2072 (Stevens, J., dissenting) (child has "extremely likely" liberty interest in preserving established familial or family-like bonds); *Blackburn v. Blackburn*, 249 Ga. 689, 692, n. 5 (292 SE2d 821) (1982) (as parens patriae, State has legitimate interest in protecting those who cannot protect themselves).

Although recognizing the competing constitutional interests of parents, children, and the State, the majority nevertheless places parents' rights above all others by requiring that a party demonstrate that parental custody would harm the child as a condition precedent. As this Court recognized in *Stills v. Johnson*, 272 Ga. 645, 651 (2) (533 SE2d 695) (2000), a showing of harm to the child has never been applied to custody disputes in this State and, in my view, it is not constitutionally required to uphold OCGA § 19-7-1 (b.1). See also *Troxel*, supra, 120 SC at 2070-2071 (Stevens, J., dissenting) ("[w]hile, as the Court recognizes, the Federal Constitution certainly protects the parent-child relationship from arbitrary impairment by the State, [cit.] we have never held that the parent's liberty interest in this relationship is so inflexible as to establish a rigid constitutional shield, protecting every arbitrary parental decision from any challenge absent a threshold finding of harm"). Although in *Brooks*, supra, a majority of this Court found unconstitutional Georgia's grandparent visitation statute because it failed to require a showing of harm before visitation could be ordered, I agree with the majority's suggestion in these appeals that the holding of *Troxel* calls into question the continued validity of the *Brooks* opinion to the extent it was decided on Federal constitutional grounds.[71] Moreover, although

---

[71] In *Troxel*, the Court noted that each of the 50 states has adopted some version of a third party visitation statute and that every state, except Georgia, permits a court to require third party visitation in certain cases if it is found to be in the best interests of the child. See *Troxel*, supra, 120 SC at 2078 (Kennedy, J., dissenting). The plurality declined to address the question of whether the Constitution requires such statutes to include, as a condition

*Troxel* addresses the issue of child visitation and not custody, I believe it is instructive and supports my conclusion that OCGA § 19-7-1 (b.1) as written is constitutionally valid.

The United States Supreme Court in *Troxel* was confronted with the State of Washington's third party visitation statute which allowed any person to petition for visitation rights with a child at any time with the only requirement being that the visitation serve the best interest of the child. The Washington Supreme Court struck down the statute on Federal constitutional grounds because the statute required no threshold showing of harm and because it swept too broadly by allowing "any person" to petition for forced visitation under a best interest of the child standard. In a plurality opinion, four justices of the United States Supreme Court found the statute unconstitutional as applied because it infringed upon the fundamental right of parents to make decisions concerning the care, custody and control of their children. *Troxel*, supra, 120 SC at 2060. Of primary concern to the Court was the absence within the statute of a requirement that a court accord a parent's decision that visitation would not be in the child's best interest any deference or presumption of validity, thereby providing no protection to the parent's fundamental constitutional right to make decisions concerning his or her child. Id. at 2061-2062.

In contrast to the "sweepingly broad" statute at issue in *Troxel*, OCGA § 19-7-1 (b.1) provides, in pertinent part:

> in any action involving the custody of a child between the parents or either parent and a third party limited to grandparent, great-grandparent, aunt, uncle, great aunt, great uncle, sibling, or adoptive parent, parental power may be lost by the parent, parents, or any other person if the court hearing the issue of custody, in the exercise of its sound discretion and taking into consideration all the circumstances of the case, determines that an award of custody to such third party is for the best interest of the child or children and will best promote their welfare and happiness. There shall be a rebuttable presumption that it is in the best interest of the child or children for custody to be awarded to the

---

precedent to ordering visitation, a showing of harm to the child but agreed that "the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied." Id. at 2064. Two justices would have reached the issue and stated their belief that a showing of harm is not constitutionally required in every instance. See id. at 2070 (II) (lack of requirement that harm be shown does not provide sufficient basis to hold invalid statute in all applications) (Stevens, J., dissenting) and id. at 2075 (Kennedy, J., dissenting) (parent does not have constitutional right to prevent visitation in all cases not involving harm).

parent or parents of such child or children.

OCGA § 19-7-1 (b.1), through the application of the best interest of the child standard, thus allows the trial court making the custody decision to consider a multitude of factors, including the fitness of the potential custodian and potential harm to the child, which affords more protection for the child. See *Stills*, supra at 650 (applying best interest of child standard to custody dispute between non-parents). At the same time, it is constitutionally significant that the statute gives substantial weight to the parents' rights by including the presumption that it is in the best interest of the child for custody to be awarded to the parent, thereby preserving the presumption that a fit parent will act in the best interest of the child. Through the inclusion of such presumption in OCGA § 19-7-1 (b.1), together with the restriction on the third parties authorized to petition for custody, the General Assembly avoided the constitutional pitfalls in the Washington statute in *Troxel*.

The precise scope of parental rights in the context of child custody must be carefully considered on a case by case basis. To focus solely on the interests of the parents, as does any standard mandating a showing of harm, ignores what may be the equally compelling interest of the child or the State in protecting the child's welfare and happiness. The facts of the two appeals before us illustrate the danger of requiring a showing of harm. The custody cases at issue do not involve a third party seeking to interfere with an established parent-child relationship but involve a biological parent seeking to gain custody of a child from grandparents who have been responsible for the daily care of the child and are now seeking to keep intact a family unit already in existence. See *Quilloin v. Walcott*, 434 U. S. 246, 255 (II) (A) (98 SC 549, 54 LE2d 511) (1978). In these circumstances, the interests of the State and the child in maintaining the stability of the only family unit the child has ever known must be accorded great weight and the biological parents' rights to the custody and control of their children must be examined in light of the fact that they have allowed third parties to raise the children for all or most of their lives. See generally *Lehr v. Robertson*, 463 U. S. 248, 260 (103 SC 2985, 77 LE2d 614) (1983) (parents' interests " 'do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.' [Cit.]"). To hold otherwise places the parents' rights above all others and treats children as the mere chattel of their biological parents.

In order to balance and protect the rights of all parties, a trial court must be authorized to consider the entirety of the circumstances and to assess the importance of the conflicting interests present in every custody dispute. Because I believe that OCGA § 19-7-1

(b.1) properly balances the competing interests of the child, the parents, and third parties authorized to seek custody under the statute and that the potential harm to the child should be but one factor to be considered by a court making a custody determination, I would not construe OCGA § 19-7-1 (b.1) to require a showing of harm but would hold it to be constitutional as written. Accordingly, I can concur only in the judgment of the majority opinion.

THOMPSON, Justice, dissenting.

This case requires this Court to decide whether OCGA § 19-7-1 (b.1), which authorizes an award of custody to a nonparent upon a showing that such an award is in the best interest of the child, is constitutional. In my view, because it only considers the best interest of the child and fails to consider the fundamental rights of parents, this Code section cannot pass constitutional muster.

Under the Due Process Clause of the Fourteenth Amendment, and our state constitution, parents have a fundamental liberty interest and privacy right in raising their children without undue state influence. *Brooks v. Parkerson*, 265 Ga. 189 (454 SE2d 769) (1995). Thus, a parent's right to the custody and control of his child is to be fiercely guarded and should be infringed upon only under the most compelling circumstances. Id.; *In re Suggs*, 249 Ga. 365, 367 (291 SE2d 233) (1982).

In *Brooks* at 190, this Court found the Georgia Grandparent Visitation Statute (OCGA § 19-7-3) unconstitutional under the state and federal constitutions. That statute permitted a grandparent to seek visitation "upon proof of special circumstances which make such visitation rights necessary to the best interest of the child." In striking down the statute, this Court concluded that grandparent visitation does not clearly promote the health and welfare of a child, and that even if it did, the statute did not require "a showing of harm before state interference is authorized." Id. at 194. Such a showing is necessary, we observed, because the state cannot impose visitation over a parent's objection unless the failure to do so would be harmful to the child. Id.

If a statute awarding *visitation* to a nonparent is unconstitutional because it does not require a showing of harm to the child, then a fortiori, a statute awarding *custody* to a nonparent is unconstitutional if it does not require a showing of harm to the child. Inasmuch as OCGA § 19-7-1 (b.1) does not require a showing of harm, it must be deemed unconstitutional under our state and federal constitutions. Id.

That the legislature enacted OCGA § 19-7-1 (b.1) after this Court rendered the decision in *Brooks*, supra, does not demonstrate ipso facto its intention to comply with *Brooks* at that time. After all, fol-

lowing *Brooks*, the legislature amended the grandparent visitation statute, OCGA § 19-7-3, to require a showing of "harm"; yet it failed to include such a requirement in subsection (b.1). Why did the legislature fail to include such a requirement? Because it intended "to move Georgia law away from a strict 'parental priority rights' standard and toward an examination of the best interest of the child when custody is at issue." 13 Ga. State Univ. L. Rev. ("Peach Sheet"), pp. 155, 157. In other words, the legislature concluded that, while *Brooks* required a showing of harm in a grandparent visitation case, such a showing was not necessary in a child custody case.[72]

My approach would be in accord with many jurisdictions which have considered this issue.[73] And it is sound. Use of the best interest of the child standard alone would permit the state to deny parents custody of their children simply because a third party can offer a "better" financial or social environment for the children. To remove a child from the custody of a parent under such circumstances would be totally inappropriate. See *Reno v. Flores*, 507 U. S. 292, 303-304 (113 SC 1439, 1448, 123 LE2d 1) (1993) ("best interests of the child" standard is appropriate for deciding which of two parents will be given custody; but it cannot be used to give custody to third party so long as the child is provided for adequately). See also *Worden v. Worden*, 434 NW2d 341 (N.D. 1989) (in the absence of "exceptional circumstances," a parent is entitled to custody of a child notwithstanding that a third party can provide better amenities); *Barstad v. Frazier*, 348 NW2d 479 (Wis. 1984) (it is improper for a court to interfere with an able parent simply because a third party would do a "better job" raising the child).

The legislature, of course, can provide for custody by a third party if such custody is in the best interest of the child *and* it is affirmatively shown that a child's parent is unfit, unable or unwilling

---

[72] The last sentence of subsection (b.1) makes this point plainly. It reads: "The sole issue for determination in any such case shall be what is in the best interest of the child or children."

[73] See, e.g., *Ex Parte Terry*, 494 S2d 628 (Ala. 1986) (parent has prima facie right to child custody absent showing of a forfeiture of parental rights or a finding of unfitness); *Langerman v. Langerman*, 321 NW2d 532 (S.D. 1982) (granting child custody to one other than a parent requires a showing of gross parental misconduct, unfitness, or extraordinary circumstances affecting child welfare); *Sheppard v. Sheppard*, 630 P2d 1121 (Kan. 1981) (statute which authorizes award of custody to third persons without a finding that parents are unfit is unconstitutional); *In the Matter of Dickson v. Lascaris*, 53 NY2d 204 (423 NE2d 361) (N.Y. 1981) (child custody by a parent may not be displaced in the absence of abandonment, unfitness or other like extraordinary circumstances); *Henderson v. Henderson*, 568 P2d 177 (Mont. 1977) (where third party seeks custody right, parent prevails unless the child has been neglected or abused); *Chandler v. Chandler*, 535 SW2d 71 (Ky. Ct. App. 1975) (custody cannot be awarded to grandparent unless it is determined that child's welfare would be better served). In fact, at least 38 states have adopted this "parental preference" principle. *Stuhr v. Stuhr*, 481 NW2d 212, 216 (Neb. 1992).

to care adequately for the child. Absent such a showing, however, a parent cannot be deprived of custody of his or her minor child.

The statute at issue fails to adequately consider the fundamental liberty interests of parents in custody cases. It is, therefore, unconstitutional.

I respectfully dissent. I am authorized to state that Justice Carley and Justice Hines join in this dissent.

DECIDED FEBRUARY 16, 2001 —
RECONSIDERATION DENIED APRIL 5, 2001.

*Case No. S00A1610*

*English, Tunkle & Smith, Richard Tunkle*, for appellants.

*Campbell & Campbell, M. Steven Campbell, Susan C. Campbell, McDonald & Cody, Phillip G. Cody, Jr.*, for appellee.

*Vicky O. Kimbrell, Hannibal F. Heredia, Vicky L. Gribble, Lisa J. Krisher, Phyllis J. Holmen, Todd C. Hughes, Stephen R. Scarborough*, amici curiae.

*Case No. S00A2014*

*Kutner & Bloom, Jean M. Kutner, David A. Webster*, for appellants.

*Moulton & Massey, John W. Moulton, Kristine M. Tarrer*, for appellee.